UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 03/19/2018

SHERRELL M. JORDAN,

                                    Plaintiff,

            – against –

COMMISSIONER OF SOCIAL SECURITY

                                    Defendant.

**OPINION**

16-cv-9634 (KHP)

**KATHARINE H. PARKER, UNITED STATES MAGISTRATE JUDGE**

        Sherrell M. Jordan ("Plaintiff") commenced this action against Defendant Commissioner of the Social Security Administration (the "Commissioner"), pursuant to the Social Security Act (the "Act"), 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking review of the Commissioner's decision that Plaintiff is not disabled under sections 216(i), 223(d), or 1614(a)(3)(A) of the Act.

        The parties have submitted cross-motions for judgment on the pleadings. For the reasons set forth below, the Commissioner's motion is GRANTED and Plaintiff's motion is DENIED.

## BACKGROUND

I.    ***Summary Of Claim And Procedural History***

        Plaintiff alleges disability due to atrial fibrillation,[1] non-toxic goiter,[2] impaired fasting

---

[1] Atrial fibrillation is "the most common type of arrhythmia" when a heart contracts very fast and irregularly. According to the National Heart, Lung, and Blood Institute, individuals with this condition "can live normal, active lives" and "[f]or some people, treatment can restore normal heart rhythms." https://www.nhlbi.nih.gov/health-topics/atrial-fibrillation (last visited March 16, 2018).

[2] A nontoxic goiter is an enlargement of the thyroid gland causing a swelling in the front part of the neck. Except in rare cases, it does not impact thyroid function. https://www.merckmanuals.com/professional/endocrine-and-metabolic-disorders/thyroid-disorders/simple-nontoxic-goiter (last visited March 16, 2018).

glucose,[3] and allergies.  (*See* Administrative Record ("Tr.") 103-20.)  On August 30, 2010, she

filed applications for disability insurance benefits ("DIB") and supplemental security income

("SSI"), alleging disability beginning August 11, 2010 due to atrial fibrillation, palpitations, non-

toxic goiter, and impaired fasting glucose.  (Tr. 324-34.)  On December 7, 2010, the Social

Security Administration (the "Administration") denied both of her claims.  (Tr. 126-31.)  Plaintiff

subsequently requested a hearing by an Administrative Law Judge ("ALJ"). (Tr. 135-37.)  A

hearing took place on November 4, 2011 before ALJ Marilyn P. Hoppenfeld.  (Tr. 42.)  On July

18, 2012, ALJ Hoppenfeld issued a decision finding Plaintiff not disabled.  (Tr. 83-98.)  The

Appeals Council denied Plaintiff's request for review of ALJ Hoppenfeld's decision on July 15,

2013.  (Tr. 99-102.)

On July 26, 2013, Plaintiff filed another application for DIB and for SSI, alleging disability

beginning July 26, 2012 due to atrial fibrillation, non-toxic goiter, impaired fasting glucose, and

allergies.  (Tr. 105-11.)  On November 7, 2013, the Administration denied both of her claims.

(Tr. 103-04.)  On April 11, 2014, the Appeals Council ordered that Plaintiff was eligible for relief

pursuant to a settlement in the *Padro et al. v. Colvin* class action lawsuit[4] and remanded

Plaintiff's case to a new ALJ.  (Tr. 121-23.)  On April 14, 2015, Plaintiff appeared for a hearing

before ALJ Dennis G. Katz, who consolidated Plaintiff's August 2010 and July 2013 applications

and evaluated Plaintiff's claim based on her original alleged onset date of August 11, 2010.  (Tr.

---

[3] Impaired fasting glucose is an intermediate metabolic state "between normal and diabetic glucose homeostasis." A person with this condition has a greater than normal level of fasting blood sugar but less than a diabetic level. https://www.ncbi.nlm.nih.gov/books/NBK11923/ (last visited March 16, 2018).

[4] On October 18, 2013, the United States District Court for the Eastern District of New York approved a settlement in the class action lawsuit *Padro et al. v. Colvin*.  (Tr. 191.)  This lawsuit challenged unfavorable and partially favorable decisions on claims for disability benefits made by five named ALJs, including Marilyn P. Hoppenfeld. (*Id.*)

27-30.) ALJ Katz issued a decision on May 12, 2015 finding Plaintiff not disabled. (Tr. 8-26.) The Appeals Council denied Plaintiff's request for review of the ALJ's decision on October 26, 2016. (Tr. 1-3.)

Plaintiff waived her right to representation at both administrative hearings, indicating at each hearing that she wished to proceed without counsel. (Tr. 30, 44-45.)[5]

## II.    The Administrative Record

### A.    Relevant Medical Evidence

Plaintiff has reported that she has a history of a heart murmur since the age of twelve. (Tr. 513.) On August 11, 2010, at the age of thirty-eight, Plaintiff was admitted to the emergency room at New York Hospital Queens with a diagnosis of atrial fibrillation and was prescribed atenolol. (*See* Tr. 57, 491-93.) During a follow-up visit with her primary care physician, Dr. Sandra Forde ("Dr. Forde") of Queens Long Island Medical Group ("QLIMG"), on August 16, 2010, Plaintiff reported feeling well. (Tr. 491.) A physical examination yielded normal findings, including normal heart rate and rhythm, no audible murmurs, no bruits in the carotid artery, and Plaintiff had no chest pain or discomfort. (Tr. 491-92.)

On August 23, 2010, Plaintiff saw cardiologist Dr. Bijoy Mehta ("Dr. Mehta") at Dr. Forde's request. (Tr. 490.) Plaintiff relayed to Dr. Mehta her recent treatment at New York Hospital Queens, noting that she had no prior history of atrial fibrillation. (*Id.*) Dr. Mehta observed that Plaintiff had a regular pulse and no carotid bruits. (*Id.*) An electrocardiogram ("EKG") showed sinus rhythm within normal limits. (*Id.*) An echo Doppler done the previous

---

[5] However, Plaintiff is represented by counsel in connection with the instant cross-motions for judgment on the pleadings.

week showed normal chamber sizes, normal systolic left ventricular function, ejection fraction in the low 70s, and "systolic prolapse of mitral valve with trace of mitral regurg[itation]." (*Id.*) Dr. Mehta recommended that Plaintiff continue taking atenolol as well as Ecotrin for at least one year because of her episode of paroxysmal atrial fibrillation. (*Id.*)

During a follow-up visit with Dr. Forde on September 3, 2010, Plaintiff stated that she still had palpitations that resolved after she took metoprolol. (Tr. 486.) Dr. Forde's assessments of Plaintiff were as follows: (1) metabolic tests revealed nonspecific abnormal findings; (2) palpitations; and (3) nontoxic autonomous thyroid nodule. (Tr. 488.)

On November 4, 2010, Plaintiff underwent a consultative examination with Dr. Joyce Graber in connection with her disability claims. (Tr. 513-16.) Upon examination, Plaintiff had a normal gait and stance, could squat halfway due to knee pain, needed no help changing for the examination or getting on and off the examination table, and was able to rise from a chair without difficulty. (Tr. 514.) She had a regular heart rhythm, with no audible murmur, gallop or rub. (Tr. 514.) Dr. Graber diagnosed heart murmur by history, atrial fibrillation by history, thyroid problem by history, and right knee pain by history. In a medical source statement, Dr. Graber opined that Plaintiff "is [not] limited from walking, lifting, carrying, bending and other such activities." (*See* Tr. 515.)

On May 8, 2012, Plaintiff saw Dr. Sheila Natbony ("Dr. Natbony") of QLIMG for an allergy consultation for suspected allergy-induced bronchospasm. (Tr. 705-10.) Plaintiff complained of a few episodes of breathing difficulties due to her "throat closing" during the previous two weeks. (Tr. 706.) Upon examination, Plaintiff had normal respiratory movements, no inspiratory retraction, and no audible decrease in breath sounds. (Tr. 708.) There was no

audible wheezing, no prolonged expiratory time, no decrease in expiratory force, and no audible rales or crackles.  (*Id.*)  Dr. Natbony assessed allergic rhinitis, for which she prescribed a nasal steroid and loratadine, and bronchospasm, for which she prescribed a leukotriene modifier and Advair.  (*Id.*)  Dr. Natbony additionally referred Plaintiff for allergy testing as well as spirometry and a chest x-ray.  (*Id.*)

When Plaintiff returned to Dr. Natbony for a follow-up appointment on May 22, 2012, Plaintiff reported that she was taking her prescribed medications as directed and was feeling better overall.  (Tr. 698.)  She reported that she had only one episode of bronchospasm since her previous visit.  (*Id.*)  Dr. Natbony noted that the results of Plaintiff's chest x-ray and spirometry were normal and that allergy testing had revealed Plaintiff was allergic to milk and dust.  (Tr. 699.)

On June 13, 2012, Plaintiff returned to Dr. Mehta for a cardiac evaluation.  (Tr. 696.)  Plaintiff had not had an arrhythmic event during the previous two years.  (*Id.*)  She denied any exertional chest pain, shortness of breath, palpitation, dizziness, fainting, or claudication.  (*Id.*)  She reported that she could walk one to two miles and climb three to four flights of stairs without any problem.  (*Id.*)  Dr. Mehta observed that Plaintiff had a regular pulse and no carotid bruits.  (*Id.*)  Dr. Mehta also noted that Plaintiff's October 2010 echo Doppler, like her August 2010 echo Doppler, showed normal chamber sizes and normal systolic left ventricular function.  (*Id.*)  It also showed a calculated ejection fraction of 75% and systolic prolapse of the mitral valve with trace mitral regurgitation. (*Id.*)  Dr. Mehta noted that Plaintiff was taking nadolol and Ecotrin and had recently been prescribed Advair Diskus for some asthma-like symptoms.  (*Id.*)

On July 24, 2012, Plaintiff visited Dr. Natbony for a follow-up allergy appointment. (Tr. 596.) Plaintiff complained of itching in her throat when exposed to grass as well as some tightness in her chest when exposed to grass, which was relieved by Advair. (Tr. 597.) Dr. Natbony assessed extrinsic asthma in addition to her continued assessments of allergic rhinitis and bronchospasm. (Tr. 598.) With respect to the latter two assessments, Dr. Natbony noted: "Good control, continue current treatment." (*Id.*)

On October 16, 2012, Plaintiff again visited Dr. Natbony for a follow-up appointment concerning her allergic rhinitis and asthma management. (Tr. 600.) Plaintiff reported feeling well and had no complaints. (Tr. 601.) Dr. Natbony noted that Plaintiff had good control of her allergies and asthma on her current treatment of Advair, fluticasone propionate, and loratadine. (Tr. 602.)

During a January 3, 2013 follow-up with Dr. Mehta, it was noted that Plaintiff "recently came with complaints of palpitation, which was quite significantly improved with nadolol." (Tr. 604.) Dr. Mehta also noted that Plaintiff "has a mild allergic asthma for which she takes occasionally Advair Diskus, still prompts short episode of palpitation." (*Id.*) Dr. Mehta added, "Otherwise, she has no palpitation." (*Id.*)

On January 22, 2013, Plaintiff visited Dr. Natbony, reporting that she was feeling well but was having some mild intermittent throat tightness that responded to medication. (Tr. 606.) Plaintiff reported that she had not had any significant asthma episodes or emergency visits in the interval between appointments. (*Id.*) She described the severity of her asthma as "mild" and indicated that she rarely used her rescue inhaler. (*Id.*) Dr. Natbony renewed Plaintiff's medication. (Tr. 607.) On June 4, 2013, Plaintiff returned to Dr. Natbony for a follow-

up appointment. (Tr. 609.) Plaintiff again reported that she had not had any significant asthma episodes or emergency visits in the interval between appointments. (Tr. 610.) She further indicated that she used her steroid inhaler only as needed, rather than routinely. (*Id.*) Dr. Natbony assessed that Plaintiff's allergic rhinitis and asthma were both well-controlled and that Plaintiff should continue her current regimen. (Tr. 611-12.)

On June 27, 2013, Plaintiff visited Dr. Mehta at the request of Dr. Forde due to an abnormal EKG. (Tr. 617.) Dr. Mehta observed no significant change from a 2010 EKG of Plaintiff except that Plaintiff's T wave had become slightly more inverted. (*Id.*) Dr. Mehta noted that Plaintiff remained asymptomatic on her medication and ordered an echo Doppler. (*Id.*) Plaintiff's July 1, 2013 Doppler showed a normal ejection fraction of 66% with trace mitral and tricuspid regurgitation, systolic prolapse of the mitral valve, and otherwise unchanged findings. (Tr. 718-19.)

On November 1, 2013, Plaintiff underwent a consultative examination by Dr. Linell Skeene ("Dr. Skeene") in connection with her claims for DIB and SSI. (Tr. 628.) Plaintiff's chief complaint was palpitations. (Tr. 628.) Her current medications were nadolol, aspirin, and Benadryl. (*Id.*) Dr. Skeene noted that the nadolol had decreased the frequency and intensity of the palpitations. (*Id.*) Plaintiff reported that the palpitations were aggravated by walking more than two blocks, climbing more than four steps, and exerting herself in other ways. (*Id.*) Plaintiff had a normal gait and stance, could squat fully, needed no help changing for the examination or getting on and off the examination table, and was able to rise from a chair without difficulty. (Tr. 629.) Dr. Skeene noted that Plaintiff had an irregular heart rhythm, but also noted that no murmur, gallop, or rub was audible. (*Id.*) Dr. Skeene diagnosed atrial

fibrillation and, in a medical source statement, opined that Plaintiff had moderate limitation for general activity due to palpitations secondary to atrial fibrillation.  (Tr. 630.)

Plaintiff's updated medication list, which was accurate as of February 18, 2015, indicated the addition of Symbicort and Ventolin prescriptions.  (Tr. 732.)

Although Plaintiff listed non-toxic goiter and impaired fasting glucose as conditions on her applications for benefits, the medical records she submitted showed that she was being monitored for these conditions and that they did not limit her functioning in any way.  (*See, e.g.*, Tr. 488, 540, 696.)

### B.    Non-Medical And Vocational Evidence

Born in 1972, Plaintiff was forty-two years old at the time of the ALJ's decision.  (*See* Tr. 374.)  She had completed two years of college, and had previously worked as a babysitter, cashier, and medical biller.  (Tr. 381.) Plaintiff testified that she continued to work as a babysitter three to four days a week, watching children approximately four or five years old. (Tr. 31-32.)

In connection with her applications for benefits, Plaintiff completed a function report on September 27, 2010.  (Tr. 336-43.)  Plaintiff represented in this report that she lived in an apartment with her six-year-old daughter.  (Tr. 336-37.)  She helped her daughter get ready for school, picked her up from school, helped her with homework, and fed and bathed her.  (Tr. 336.)  She had no problems with self-care.  (Tr. 337-38.)  She prepared meals three times a week, cleaned her apartment, did laundry, and shopped for food without help.  (Tr. 338.)  She went outside every day by walking or using public transportation and was capable of doing so alone.  (Tr. 339.)  She attended church twice a week and read daily.  (Tr. 340.)  She reported

that she could not lift heavy boxes, that she could not squat because it hurt her legs, and that her knees hurt when she kneeled.  (Tr. 341.)

Plaintiff completed another function report on September 14, 2013, in connection with her applications for DIB and SSI.  (Tr. 387-95.)  She reported that she took care of her daughter.  (Tr. 388.)  She stated that she woke up at least twice per night.  (*Id.*)  She had no problems with personal care.  (Tr. 388-90.)  She prepared meals twice per week, cleaned her apartment, and did laundry without help.  (Tr. 390.)  She went outside six days a week by walking or using public transportation and was capable of doing so alone.  (*Id.*)  She shopped for food in stores once a week, for 20 to 30 minutes.  (Tr. 391.)  She attended church once a week and took her daughter to school five days a week.  (Tr. 392.)  She reported having problems lifting due to a sore lower back, that she could not kneel or squat, that she could climb stairs "fine," and that she could do other postural activities "O.K."  (Tr. 392-93.)

At Plaintiff's November 4, 2011 hearing, she testified that she took a bus to attend the hearing.  (Tr. 48.)  Plaintiff further testified that she could stand for about 20 minutes, that she could bend "but not all the way down," and that she could sit for about one hour before becoming uncomfortable.  (Tr. 71.)

At the April 14, 2015 hearing, with respect to her part-time work, she testified she had been living in a shelter for the previous two years, so she babysat at her employers' homes.  (Tr. 35.)  She testified that she had no choice but to do the housework and shopping herself because she was a single mother to her ten-year-old daughter.  (Tr. 34-35.)  She had palpitations from her atrial fibrillation since 2010, but medications helped; she still felt palpitations from time to time.  (Tr. 33-34.)  She had difficulty walking up stairs but had no

trouble walking or sitting. (Tr. 35-36.) Her medications sometimes caused dizziness or insomnia. (Tr. 36.) She had not tried looking for less strenuous work, such as an office job. (*Id.*) Plaintiff testified that she would not be able to work full-time because of her heart condition. (Tr. 38.)

Vocational expert ("VE") Helene Feldman also testified at the hearing. (Tr. 39.) The ALJ asked the VE if a person unable to work a full 40-hour week would be able to find unskilled full-time employment. (*Id.*) The VE stated that such a person would not be able to maintain a job. (*Id.*)

### C. Commissioner's Decision

ALJ Katz determined that Plaintiff met the insured status requirements under the Act through December 31, 2017. (Tr. 13.) The ALJ found that Plaintiff had not engaged in substantial gainful activity since August 11, 2010, the alleged onset date. (Tr. 14.) The ALJ determined that Plaintiff had the following impairments considered "severe" under the Act: asymptomatic mitral valve murmur/mitral prolapse syndrome and atrial fibrillation. (*Id.*) However, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings"). (Tr. 15.) The ALJ found that Plaintiff retained the residual functional capacity ("RFC") to perform the full range of light exertion level work in that she has been able to sit for a total of 8 hours and stand/walk for a total of 6 hours during the course of an 8-hour workday; and has been able to lift/carry objects weighing a maximum of 20 pounds. (*Id.*) The ALJ additionally found that Plaintiff can occasionally traverse stairs in the workplace. (*Id.*)

The ALJ determined that Plaintiff could perform her past relevant work as a medical biller and bill collector. (Tr. 19.)  In the alternative, the ALJ concluded that, considering Plaintiff's age (thirty-eight years old on the alleged disability onset date), education (at least a high school education), work experience, and RFC, there are other jobs that exist in significant numbers in the national economy that Plaintiff also could perform. (*Id.*)  The ALJ found that transferability of job skills is not material to the determination of disability because applying the Medical-Vocational Rules directly supports a finding of "not disabled," whether or not Plaintiff has transferable job skills. (*Id.*)  Accordingly, the ALJ found that Plaintiff had not been under a disability, as defined in the Act, from August 11, 2010 through the date of the ALJ's decision. (Tr. 20.)

## DISCUSSION

### I.      *The Applicable Law*

#### A.      *Judicial Standard Of Review Of Commissioner's Determination*

The court's review of an appeal of a denial of disability benefits is limited to two inquiries. *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987).  First, the court must determine whether the Commissioner applied the correct legal principles in reaching a decision. 42 U.S.C. § 405(g); *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999).  Second, the court must decide whether the Commissioner's decision is supported by substantial evidence in the record. *Id*.  So long as they are supported by substantial evidence in the administrative record, the findings of the ALJ after a hearing as to any facts are conclusive. 42 U.S.C. §§ 405(g), 1383(c)(3).

An ALJ's failure to apply the correct legal standard constitutes reversible error if that failure might have affected the disposition of the case. *Kohler v. Astrue*, 546 F.3d 260, 265 (2d

Cir. 2008).  This applies to an ALJ's failure to follow an applicable statutory provision, regulation, or Social Security Ruling ("SSR").  *See, e.g.*, *Kohler*, 546 F.3d at 265 (regulation); *Schaal v. Callahan*, 993 F. Supp. 85, 93 (D. Conn. 1997) (SSR).  In such a case, the court may remand the matter to the Commissioner under sentence four of 42 U.S.C. § 405(g), especially if deemed necessary to allow the ALJ to develop a full and fair record to explain his or her reasoning.  *Crysler v. Astrue*, 563 F. Supp. 2d 418, 429 (N.D.N.Y 2008).

If the reviewing court is satisfied that the ALJ applied correct legal standards, then the court must "conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision."  *Brault v. Soc. Sec. Admin. Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (*per curiam*) (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)).  Thus, the court does not determine *de novo* whether a claimant is disabled.  *Id.* (citing *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996)).  The Supreme Court has defined substantial evidence as requiring "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  The substantial evidence standard means once an ALJ finds facts, a reviewing court may reject those facts "only if a reasonable factfinder would have to conclude otherwise."  *Brault*, 683 F.3d at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)) (emphasis omitted).

To be supported by substantial evidence, the ALJ's decision must be based on consideration of "all evidence available in [the claimant]'s case record."  42 U.S.C. §§ 423(d)(5)(B), 1382a(3)(H)(i).  The Act requires the ALJ to set forth "a discussion of the

evidence" and the "reasons upon which [the decision] is based." 42 U.S.C. § 405(b)(1).  While

the ALJ's decision need not "mention[] every item of testimony presented," *Mongeur v.

Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) (*per curiam*), or "reconcile explicitly every

conflicting shred of medical testimony," *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010)

(internal quotation marks omitted), the ALJ may not ignore or mischaracterize evidence of a

person's alleged disability.  *See Ericksson v. Comm'r of Soc. Sec.*, 557 F.3d 79, 82-84 (2d Cir.

2009) (mischaracterizing evidence); *Kohler*, 546 F.3d at 268-69 (overlooking and

mischaracterizing evidence); *Ruiz v. Barnhart*, No. 01-cv-1120 (DC), 2002 WL 826812, at *6

(S.D.N.Y. May 1, 2002) (ignoring evidence); *see also Zabala*, 595 F.3d at 409 (reconsideration of

improperly excluded treating physician evidence typically requires remand).  Eschewing rote

analysis and conclusory explanations, the ALJ must discuss the "the crucial factors in any

determination . . . with sufficient specificity to enable the reviewing court to decide whether

the determination is supported by substantial evidence." *Calzada v. Astrue*, 753 F. Supp. 2d

250, 269 (S.D.N.Y. 2010) (quoting *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984)).  If the

decision denying benefits applied the correct legal standards and is based on substantial

evidence, the reviewing court must affirm; if not, the court may modify or reverse the decision,

with or without remand.  42 U.S.C. § 405(g).

**B.**      ***Legal Principles Applicable To The Commissioner's Disability Determination***

Under the Social Security Act, every individual considered to have a "disability" is entitled

to disability insurance benefits.  42 U.S.C. § 423(a)(1).  The Act defines "disability" as an

"inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant's impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether an individual is entitled to receive disability benefits, the Commissioner is required to conduct the following five-step inquiry:

(1) First, determine whether the claimant is currently engaged in any substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i).

(2) Second, if not gainfully engaged in any activity, determine whether the claimant has a "severe impairment" that significantly limits his or her ability to do basic work activities. Under the applicable regulations, an impairment or combination of impairments that significantly limits the claimant's ability to perform basic work activities is considered "severe." 20 C.F.R. § 404.1520(c)(a)(4)(ii).

(3) Third, if the claimant has a "severe impairment," determine whether the impairment is one of those listed in Appendix 1 of the regulations – if it is, the Commissioner will presume the claimant to be disabled and the claimant will be eligible for benefits. 20 C.F.R. § 404.1520(c)(a)(4)(iii). At this stage, the Commissioner also must determine the claimant's residual functional capacity ("RFC"); that is, her ability to perform physical and mental work activities on a sustained basis despite her impairments.[6] 20 C.F.R. § 404.1520(e).

---

[6] A claimant's residual functional capacity is "the most [she] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a); *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010); *see also* S.S.R. 96-9P (clarifying that a claimant's residual functional capacity is his maximum ability to perform full-time work on a regular and continuing basis).

(4) Fourth, if the claimant does not meet the criteria for being presumed disabled, the Commissioner next must determine whether the claimant possesses the RFC to perform her past work.  20 C.F.R. § 404.1520(a)(4)(iv).

 (5) Fifth, if the claimant is not capable of performing work she performed in the past, the Commissioner must determine whether the claimant is capable of performing other work. 20 C.F.R. § 404.1520; *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999); *Gonzalez v. Apfel*, 61 F. Supp. 2d 24, 29 (S.D.N.Y. 1999).  The claimant bears the burden at the first four steps.  *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013).  However at the last step, the Commissioner has the burden of showing that "there is other gainful work in the national economy which the claimant could perform."  *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998).

### C.    Duty To Develop The Record

In Social Security proceedings, the ALJ must affirmatively develop the record on behalf of all claimants.  *See Moran,* 569 F.3d at 108, 112.  As part of this duty, the ALJ must investigate the facts and develop the arguments both for and against granting benefits.  *Id.*  Specifically, under the applicable regulations, the ALJ is required to develop a claimant's complete medical history.  *Pratts,* 94 F.3d at 34, 37 (citing 20 C.F.R. §§ 404.1512(d)-(f)).  This responsibility "encompasses not only the duty to obtain a claimant's medical records and reports, but also the duty to question the claimant adequately about any subjective complaints and the impact

---

The ALJ's assessment of a claimant's residual functional capacity must be based on "all relevant medical and other evidence," including objective medical evidence, such as x-rays and MRIs, the opinions of treating and consultative physicians, and statements by the claimant and others concerning the claimant's impairments, symptoms, physical limitations, and difficulty performing daily activities.  *Genier*, 606 F.3d at 49 (citing 20 C.F.R. § 404.1545(a)(3)).

of the claimant's impairments on the claimant's functional capacity." *Pena v. Astrue,* No. 07-cv-11099 (GWG), 2008 WL 5111317, at *8 (S.D.N.Y. Dec. 3, 2008) (internal citations omitted).

Whether the ALJ has met his/her duty to develop the record is a threshold question. Before reviewing whether the Commissioner's final decision is supported by substantial evidence under 42 U.S.C. § 405(g), "the court must first be satisfied that the ALJ provided plaintiff with a full hearing under the Secretary's regulations and also fully and completely developed the administrative record." *Scott v. Astrue,* No. 09-cv-3999 (KAM), 2010 WL 2736879, at *12 (E.D.N.Y. July 9, 2010) (internal quotations and citations omitted). The ALJ must develop the record even where the claimant has legal counsel. *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996). Remand is appropriate where this duty is not discharged. *See, e.g., Moran,* 569 F.3d at 114-15 ("We vacate not because the ALJ's decision was not supported by substantial evidence but because the ALJ should have developed a more comprehensive record before making his decision.").

## II.     *Application Of The Legal Standards To Plaintiff's Claims*

### A.     *Development of the Record*

The Court finds that the Commissioner applied the correct legal principles in reaching his decision in this case. Plaintiff contends that ALJ Katz failed to fully develop the administrative record by (1) failing to seek clarification from consultative examiner Dr. Graber concerning a typographical error in her medical source statement; (2) failing to seek clarification from consultative examiner Dr. Skeene concerning the definition of the word "moderate"; and (3) failing to seek a medical source statement from a treating source.

Although an ALJ's duty to develop the administrative record is heightened when a

claimant is not represented by counsel at the administrative hearing, *see Rutkowski v. Astrue*, 368 F. App'x 226, 229 (2d. Cir. 2010) (citing *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990)), "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." *Rosa*, 168 F.3d at 79 n.5 (citing *Perez*, 77 F.3d at 48). As set forth below, the Court concludes that the ALJ had no obligation to undertake any of the inquiries suggested by Plaintiff and otherwise fully developed the administrative record in compliance with 20 C.F.R. § 404.1512(d).

### 1.    *Dr. Graber's Medical Source Statement*

ALJ Katz, in reaching his RFC determination, appropriately gave some weight to Dr. Graber's November 2010 opinion that Plaintiff "is [not] limited from walking, lifting, carrying, bending and other such activities." (Tr. 18, 515.) Plaintiff takes issue with the ALJ's insertion of the word "[not]" to correct a perceived typographical error in Dr. Graber's medical source statement. Plaintiff argues that the ALJ had a duty to seek clarification from Dr. Graber as to whether her opinion was accurately reflected in the record or whether a typographical error, in fact, existed. Plaintiff further contends that such failure created a "gap" in the record necessitating remand.

Contrary to Plaintiff's contention, an ALJ may determine that a typographical error exists in a physician's opinion where the physician's intended statement is "clear from the context" thereof. *See*, *e.g.*, *Wells v. Colvin*, 87 F. Supp.3d 421, 433 (W.D.N.Y. 2015); *Cook v. Comm'r of Soc. Sec.*, No. 10-cv-259 (GTS) (ATB), 2011 WL 1899299, at *5 n.3 (N.D.N.Y. Jan. 3, 2011). In *Wells*, it was evident that a physician's statement that "'there are restrictions to

sitting, standing, and walking on even surfaces' was likely intended to state that there were *no* such restrictions." *Wells*, 87 F. Supp.3d at 433 (emphasis in original). Indicators that the physician intended to find no such restrictions included the physician's normal examination findings as well as the physician's subsequent statement that there were no restrictions to, *inter alia*, walking on uneven terrain. *Id.*

Here, just as in *Wells*, it is evident from the face of the physician's report that Dr. Graber's physical examination of Plaintiff resulted in normal findings. (*See* Tr. 514-15.) Specifically, Plaintiff was found to have a normal gait and stance as well as the ability to walk on her heels and toes without difficulty. (Tr. 514.) Additionally, Plaintiff was found to have a regular heart rhythm with no audible murmur, gallop, or rub. (*Id.*) Plaintiff was also found to have full strength and ranges of motion, stable and nontender joints, no muscle atrophy, and normal neurological findings. (Tr. 515.) Moreover, as in *Wells*, Dr. Graber described Plaintiff's abilities in a manner indicating that she intended to find *no* limitations from walking, lifting, carrying, bending, or other such activities. In particular, Dr. Graber noted that Plaintiff was capable of walking outside, cooking and cleaning twice a week, going shopping, and doing laundry once a month. (Tr. 513-14.) She also noted that Plaintiff was capable of showering and dressing herself on a daily basis without assistance. (Tr. 514.) Thus, in light of the entirety of Dr. Graber's examination report and opinion, it was not error for the ALJ to find that Plaintiff was not limited in her ability to walk, lift, carry, bend, and other similar activities.

### 2. Dr. Skeene's Medical Source Statement

ALJ Katz appropriately gave some weight to Dr. Skeene's November 2013 opinion assessing "moderate" limitation for general activity "due to palpitations, secondary to atrial

fibrillation." (Tr. 18, 630.) In doing so, he noted that, while Dr. Skeene's assessment was "vague," her actual clinical findings were valid and entitled to some weight and her conclusions and findings were supported by Dr. Graber's opinion. (Tr. 18.) ALJ Katz also stated that, although the term "moderate" was not precisely defined, "the clinical observations that were made are consistent with the [RFC] determined by the undersigned." (Tr. 17.) Plaintiff contends that the ALJ had a duty to seek clarification from Dr. Skeene as to the meaning of her assessment and that the ALJ's failure to do so created a gap in the administrative record.

However, the "mere use of the phrase 'moderate limitations' does not render a doctor's opinion vague or non-substantial for purposes of the ALJ's RFC determination." *Dier v. Colvin*, No. 13-cv-502 (WMS), 2014 WL 2931400, at *4 (W.D.N.Y. June 27, 2014) (citing *Tudor v. Comm'r of Soc. Sec.*, No. 12-cv-2795 (SJF), 2013 WL 4500754, at *12 (E.D.N.Y. Aug. 21, 2013)). In *Tudor*, the court found that an assessment of Dr. Skeene – the same Dr. Skeene who examined Plaintiff here – that used the phrase "moderate limitations" could serve as an adequate basis for the ALJ's determination where it was "supported by additional information, *i.e.*, objective medical findings." *Tudor*, 2013 WL 4500754, at *12 (internal quotation marks and citations omitted). Here, there is no question that Dr. Skeene's opinion was supported by her own objective medical findings. Dr. Skeene noted Plaintiff's irregular heart rhythm but otherwise observed Plaintiff's normal gait and stance, full strength and ranges of motion, stable and nontender joints, and lack of muscle atrophy. (Tr. 629-30.)

Moreover, a number of courts have found that "moderate" limitations for standing, walking, sitting, and lifting are consistent with the ability to do light work. *See, e.g., Stacey v.*

*Comm'r of Soc. Sec.*, No. 09-cv-0638 (DNH) (VEB), 2011 WL 2357665, at *6-7 (N.D.N.Y. May 20, 2011) (consultative examiner's opinion that claimant appeared to have "moderate limitations in activities that require bending, lifting, prolonged sitting, and prolonged standing and walking" was consistent with ALJ's determination that claimant retained RFC to perform wide range of light work); *Amons v. Astrue*, 617 F. Supp.2d 173, 176 (W.D.N.Y. 2009) (examining physician reports reflecting "moderate limitations in walking, standing, squatting, climbing and reaching" supported ALJ's determination that claimant could perform full range of light work with some fingering/reaching and environmental limitations).

### 3.    *Lack Of Medical Source Statement From Treating Source*

Plaintiff contends that the ALJ's duty to develop the record also included a duty to request a medical source statement from a treating doctor and, accordingly, that the ALJ's failure to do so constitutes error necessitating remand.  However, the social security regulations in effect when the ALJ adjudicated Plaintiff's claims provided that medical reports "*should*" include a "'statement about what [a claimant] can still do despite [his or her] impairment,' not that they *must* include such statements."[7]  *See Tankisi v. Comm'r of Soc. Sec.*, 521 Fed. App'x 29, 33 (2d Cir. 2013) (citing 20 C.F.R. §§ 404.1513(b)(6), 416.913(b)(6)) (emphasis in original).  The regulations additionally indicated that "the lack of the medical source statement will not make the report incomplete."  *Id.*; *see also Swiantek v. Comm'r of Soc. Sec.*, 588 Fed. App'x 82, 84 (2d Cir. 2015); *Pellam v. Astrue*, 508 Fed. App'x 87, 90 n.2 (2d Cir. 2013).  The need – or lack thereof – for a medical source statement from a treating source

---

[7] On March 27, 2017, Sections 404.1513 and 416.913 were modified and the quoted language deleted.  However, the Court applies the versions of the regulations in effect when the ALJ adjudicated Plaintiff's claims.  *See Lowry v. Astrue*, 474 Fed. App'x 801, 804 n.2 (2d Cir. 2012).

will hinge on the "circumstances of the particular case, the comprehensiveness of the administrative record, and, at core, whether an ALJ could reach an informed decision based on the record." *Sanchez v. Colvin*, No. 13-cv-6303 (PAE), 2015 WL 736102, at *5 (S.D.N.Y. Feb. 20, 2015). Where, as here, the RFC determination is otherwise supported by the treating doctors' or a consultative examiner's clinical findings, and the ALJ has a complete record from the treating doctors, the ALJ is not required to obtain additional medical source statements from treating doctors. *See, e.g., Tankisi*, 521 Fed. App'x at 33-34; *Swiantek*, 588 Fed. App'x at 84; *Pellam*, 508 Fed. App'x at 90-91. Thus, Plaintiff's contention on this point lacks merit.

### B. Substantial Evidence In Support Of Commissioner's Decision

Plaintiff argues that the Commissioner's decision denying disability benefits is not supported by substantial evidence. Specifically, Plaintiff asserts that because neither Dr. Graber nor Dr. Skeene reviewed her medical records prior to delivering their assessments – in purported violation of the social security regulations – their examinations cannot constitute substantial evidence in support of the ALJ's RFC decision. As discussed below, Plaintiff's argument is without merit and substantial evidence supports the Commissioner's RFC assessment and ultimate finding that Plaintiff is not disabled within the meaning of the Act.

### 1. Sufficiency Of Opinion Evidence

Plaintiff argues that 20 C.F.R. §§ 404.1517, 416.917 requires an ALJ to supply consultative examiners with "necessary background information" about a claimant's condition. Based upon her interpretation of the regulation, Plaintiff contends that the ALJ should have supplied Drs. Graber and Skeene with, at a minimum, Plaintiff's cardiology records and imaging reports and that the ALJ's failure to do so constitutes reversible error.

But, contrary to Plaintiff's contention, there is no regulation that clearly requires an ALJ to provide a consultative examiner with claimant's medical records. *Johnson v. Colvin*, No. 13-cv-3745 (KAM), 2015 WL 6738900, at *15 (E.D.N.Y. Nov. 4, 2015). The courts in this circuit have not interpreted "necessary background information" to mean a claimant's medical and/or diagnostic records. *See Mayor v. Colvin*, No. 15-cv-0344 (AJP), 2015 WL 9166119, at *18 n.24 (S.D.N.Y. Dec. 17, 2015) (noting that, particularly where a consultative physician has directly examined the claimant, there is no requirement that such physician's opinion be disregarded because of a lack of review of prior records); *Genovese v. Astrue*, No. 11-cv-02054 (KAM), 2012 WL 4960355, at *18 (E.D.N.Y. Oct. 17, 2012) ("The SSA's statement that an examiner must be given 'necessary background information about [a claimant's] condition,' 20 C.F.R. §§ 404.1517, 416.917, does not mandate that 'the examiner must be provided with plaintiff's medical records,' as plaintiff asserts it does.").

Here, the consultative examiners' reports establish that all of the regulatory requirements of a complete consultative examination were met because both Drs. Graber and Skeene obtained significant background information concerning Plaintiff and provided a detailed account of the same, including Plaintiff's medical and treatment history, her reported complaints, and her reported level of functioning at the time of the examination. (Tr. 513-16, 628-30.)

### 2. *Substantial Evidence Supporting ALJ's Determinations*

The ALJ, in reaching his RFC determination, considered and gave some weight to the two medical opinions in the record assessing Plaintiff's ability to perform work activities. The ALJ appropriately based the exertional portion of the RFC on the opinion of consultative

examiner Dr. Graber that Plaintiff was not limited in her ability to walk, lift, carry, bend, and other similar activities. (Tr. 18.) He also properly determined that, while Dr. Skeene's conclusion (assessing "moderate" limitation) itself was vague, her actual clinical findings were valid and entitled to some weight, and her conclusions and findings were supported by Dr. Graber's opinion. (*Id.*)

In addition to the consultants' findings and conclusions, other medical evidence supported the ALJ's RFC determination of light work. The ALJ noted that Plaintiff's physical examinations by her treating cardiologist were consistently within normal limits. (Tr. 17; *see* Tr. 658-59, 663, 680, 696, 719, 725.) Dr. Mehta not only noted cardiac findings within normal limits, but also observed no evidence of joint tenderness, joint deformity, or limitations of movement. (Tr. 658-59, 680, 696.) Dr. Natbony observed that Plaintiff had normal respiratory movements and exhibited no inspiratory retraction, decrease in breath sounds, wheezing, prolonged expiratory time, decrease in expiratory force, or rales/crackles. (Tr. 598, 602, 611, 699, 708.) Dr. Forde too observed Plaintiff's normal heart rate, heart rhythm, and heart sounds, lack of murmurs, normal respiratory movements and breath sounds, and normal musculoskeletal system. (Tr. 487, 492, 544.) All of these findings by Plaintiff's treating physicians are consistent with the consultative examiners' opinions as well as with an RFC of light work, which "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds" and may involve a good deal of walking or standing, or sitting most of the time with some pushing and pulling of arm or leg controls. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b).

Similarly, Plaintiff's diagnostic testing revealed mostly normal results, with Plaintiff's

last echo Doppler showing a normal ejection fraction of 66%. (Tr. 719.) A chest x-ray and spirometry for evaluation of bronchospasm were also normal. (Tr. 699.) Additionally, Plaintiff's treating cardiologist found that Plaintiff was asymptomatic on medication therapy. (Tr. 658.) Plaintiff's allergic rhinitis and asthma likewise were well-controlled on her current treatment, and Plaintiff acknowledged that she rarely used her rescue inhaler. (Tr. 606-07.) These test results and findings are entirely consistent with the ALJ's conclusion that Plaintiff was capable of performing light work.

Furthermore, the ALJ found that Plaintiff's activities of daily living indicated that she had a much greater RFC than alleged. (Tr. 16-18.) Her reported activities included independent personal care, caring for her child, cleaning, doing laundry, shopping, attending church, and going out daily. (Tr. 17-18, *referring to* Tr. 339, 628.) The ALJ noted Plaintiff's admission in June 2012 that she could walk one to two miles and climb three to four flights of stairs without any problem. (Tr. 17, *referring to* Tr. 696.) Thus, the ALJ's finding that Plaintiff's activities of daily living undermined her allegations of complete disability was reasonable. (Tr. 16-18.) *See Poupore v. Astrue*, 566 F.3d 303, 307 (2d Cir. 2009) (claimant's varied activities of daily living, including performing childcare and occasionally vacuuming and washing dishes, supported ALJ's proper conclusion that claimant's testimony about purported limitations was not fully credible).

Additionally, during the period for which Plaintiff alleged disability, Plaintiff worked part-time (approximately three to four days a week) as a babysitter, caring for children as young as four years old. (Tr. 31-32.) The ALJ properly noted that part-time work did not per se disqualify Plaintiff from benefits, but accurately noted that childcare is usually performed

at the light exertion level, supporting the conclusion that Plaintiff's work activity demonstrated her ability to meet the exertional demands of at least light work. (Tr. 17.) *See* 20 C.F.R. § 404.1567(b), 416.967(b); *see also Rivers v. Astrue*, 280 Fed. App'x 20, 23 (2d Cir. 2008) (noting that while claimant's work during the relevant period did not meet the threshold for substantial gainful activity, she nonetheless performed work at a level consistent with light work). The ALJ additionally considered Plaintiff's testimony that her babysitting job required her to travel to her employers' homes, (Tr. 35), in reaching a conclusion as to her RFC.[8]

In sum, substantial evidence from Plaintiff's treating and consultative doctors as well as Plaintiff's own testimony supports the ALJ's decision denying Plaintiff's claim for disability.

## CONCLUSION

For the foregoing reasons, the Commissioner's motion is GRANTED and Plaintiff's motion is DENIED. The Clerk of Court is respectfully directed to close this case.

---

[8] Though mentioned by Plaintiff during the hearing, the ALJ was not required to consider Plaintiff's alleged right knee pain or left elbow tear in reaching his RFC determination because Plaintiff did not list these impairments in either of her applications for disability. (Tr. 105-11, 324-34.) Similarly, although listed in her application for benefits, the ALJ did not err by failing to discuss Plaintiff's non-toxic goiter and impaired fasting glucose in his decision. (*See* Tr. 105, 329.) Plaintiff did not argue that this omission was error requiring remand, nor could she, because neither of these conditions was an impairment that needed to be considered for purposes of the five-step sequential analysis. *See* 42 U.S.C. § 423(d)(3) (defining "physical or mental impairment" as an "impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques"). To the contrary, all of the medical evidence submitted and Plaintiff's testimony at the hearings demonstrated that she was not functionally limited in any way from these conditions. (Tr. 67-68, 482, 500, 540, 597.) Thus, even if the ALJ were required to and did consider these conditions, the outcome of Plaintiff's claim for benefits would not change. *Zabala*, 595 F.3d at 409; *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 123 (2d Cir. 2012) (it is a plaintiff's burden to demonstrate disability); *Diaz v. Shalala*, 59 F.3d 307, 315 (2d Cir. 1995) (lack of evidence showing functional limitation constitutes substantial evidence that limitation does not exist).

Dated: New York, New York
       March 19, 2018

KATHARINE H. PARKER
United States Magistrate Judge